Good morning, Your Honors. Lisa Zick, on behalf of Glen Burke, I would like to reserve two minutes for rebuttal, if possible. May it please the Court. Your Honor, this is a case that started, Your Honors, this is a case that started from a 1998 permanent injunction, which permanently enjoined Mr. Burke from engaging in activity misrepresenting material facts to induce consumers to purchase an item. He stipulated to that injunction, he signed it, he was aware of it. This underlying case started in 2013 by the FTC filing a motion in district court for a temporary restraining order and a preliminary injunction, alleging that Mr. Burke had resumed activities that he was enjoined from doing from that 1998 order. Initially, it involved two schemes, a telemarketing scheme, which is not at issue in this appeal, and a mail fraud sweepstakes scheme. Excuse me. An oral argument was heard on both the motion for temporary restraining order and preliminary injunction at the district court level, at which point Mr. Burke presented evidence contrary to the FTC's position that he had engaged in fraudulent activity or in any activity that was prohibited from the 1998 order. And that would include assisting anyone else in any of these schemes? That is correct, Your Honor. At the oral argument. I don't know where my colleagues stand, but I'd like you to address the assisting. How is it that he can be a consultant, which everybody admits that he was consulting on a mail scheme? Well, Your Honor, the — And how does that not qualify as assisting? Consulting on a mail scheme, on a sweepstakes scheme, if that sweepstakes scheme is lawfully conducted, it would not have violated the 1998 permanent injunction. And I don't think that there was ever a determination made that the overall mail fraud scheme that's at issue here was fraudulent. The court addressed some of the fraudulent mailers, and that's part of what is at issue here. If you look at our briefs, it's very fact-heavy on the evidence that was presented. And, Your Honor, speaking specifically about the mailers, on their face, disclosures were provided to the consumers. Well, first, and I take issue with that word consumer, because the Mr. Burke, it was argued in the briefs initially, it was argued at oral argument, it's in our briefs on the record in front of this Court here today, that there was no — I don't see anything. I'm looking at the injunction. And I don't see that the injunction refers to fraudulent schemes. That is, there has to be a determination that something in the scheme is fraudulent. This looks pretty broad. Well, Your Honor, I think it goes to that material misrepresentation in section B. And part of this says, and I'm looking at page 4 of the original order, the injunction, and B-4 says that he is barred from performing marketing services of any kind for an entity. And that's an entity that is engaging in telephone sales script or other marketing material. Well, and Your Honor, this is why the telemarketing scheme is not at issue here, because I don't believe that. And if you could give me an excerpt page so I can read what you're reading. The excerpt page is ER-126. Well, did you raise this issue that, apparently, it's your interpretation that the injunction requires, you know, a fraudulent scheme. Did you raise the issue with the district court that, well, this was not fraudulent? We did, Your Honor. And what did the district court say? It was in the underlying briefs. And if you look at the transcripts on the record, Mr. Spalatro argued that the sweepstakes What did the district court say? Well, which order, because that's the other issue that was here. But I think the final order, the 2016 order, which is also at issue in our briefs here before the Court today, they took the FTC's position that the sweepstakes were, in fact, fraudulent. But up until that March 2016 order, there had never actually been findings of facts with respect to the underlying schemes at all. And it's our position that the FTC, that the under And is it your position that when you get a notice that you've won $500,000 and you just need to provide money for fee processing and you get a check for $1.12, that that's not fraudulent? No, Your Honor, that's not my position. But it's also my Do you concede then that that kind of a scheme would be fraudulent? That kind of a scheme would be fraudulent, yes. But if you look at the mailers on their face and looking at them, at a quick glance, yes, it looks like I get this notice in the mail. It says I've won $500 million, and all I have to do is send in this check and I'm going to get $500 million. But if Why do you just look at the mailers instead of the overall scheme? I'm sorry? Why do you just look at the mailers instead of the overall scheme? Because the issue is with the mailers pursuant to the overall scheme. If the mailers themselves are fraudulent No, the issue is, I mean, he helped create the mailers, but the mailers are part of the overall scheme. So he's assisting. The question is, was he assisting the scheme, right? Yes, Your Honor. But what's interesting is that you said he helped create. We also take issue with that position because Mr. Burke was employed by a gentleman named Earl Seals. There is deposition testimony. There is an affidavit signed by Mr. Seals. There's an exchange of e-mails. Mr. Burke did not actually create these mailers. Did he review mailers that were sent to him? Sure, there's e-mails that say that he helped create them. But there's a lot of it. Well, yes, Your Honor, but the e-mails were already created. Excuse me, the mailers were already created. Even so, there's a lot of evidence that he assisted and consulted in creating those mailers, making them better, making them more attractive, right? Isn't that assisting? Well, I don't know that he did anything to create or make them better. Well, maybe make them worse. If that had happened, yes, that would be assisting. But what's interesting is that if you look at it, it says, yes, he cannot assist anyone, and the important part of that in 1998 injunction, though, is the material misrepresentation. Okay. So, counsel, for example, I'm looking at ER-414. I'm looking at an e-mail from Good to Burke that says, Glenn, here is something for your artist to try. I want it to look like it came from a law firm on official paper with borders. I want it to simulate what a contract looks like with printed on little yellow stickers where everyone is shown to sign. So that is an e-mail that was sent to Mr. Burke, and that mailer, something for your artist to try, would indicate that that mailer was already created and what Mr. Burke had access to, an artist who could actually create that based on this individual's design. And that's not assisting? I'm not arguing that it's not assisting, Your Honor. Okay. If it's assisting, then what's the issue? Well, the issue is that under the 1998 injunction, the material misrepresentation to induce a consumer. It doesn't say that it has to not be fraudulent, but a material misrepresentation, he is prohibited from making material misrepresentation. And the flyers that we've seen in here telling people that they've won and you definitely have won and you just need to send us money and we'll get you your check. I don't think that that's what they say, and that's the point that I was trying to make. There's disclosures listed on every one of these mailers, and the first line of every one of those disclosures, and I can cite to some specific ones that the Court would like, but the first line on every one of them is no purchase necessary. Also, nowhere do they expressly say you've won money. There's an amount of money on the mailer, and if you read it closely, it says documents will be provided. Were these people asked to provide a fee when they entered? Yes, but they were also told that they didn't have to and they would still be eligible for the same sweepstakes. And so they were told that. They were told one thing, that you should provide some money to us, but they were told elsewhere that they didn't have to provide it. They were told that if they provided money, that they would also, they would receive something in return for that. And that would be misleading? I'm sorry? That's not misleading? Well, they were told that if they provide money, they would receive something in exchange for that, but they would still be eligible. Mr. Burke was helping to get all these checks deposited, right? Well, he was the processor for overseeing the funds. And the checks amounted to $20 million? By the FTC's math, yes. Okay. How much money did they pay out? That I don't have a number on. $1.12 a pop? It wasn't very high. It wasn't. Not all of them were $1.12. Well, there's deposition testimony by Ms. Lindsay Reed. And I'm at two minutes, Your Honor. But there's deposition testimony by Lindsay Reed that she was part of fulfilling those prizes and that prizes for more than $1.12 or 79 cents were paid. And how much, what was the largest prize that she could remember? $100, I believe is what she testified. $100. Yes, Your Honor. She took in $20 million and you paid out checks of $1.12 and maybe $100 to somebody. That's correct. But, and again, I would ask the Court to look at the disclosures, because if you look at the disclosures that were contained within these mailers themselves, there's actually a ratio to them. And $1.12, 79 cents, $100 winnings are listed on those sweepstakes. Yeah. If you read the small print on the back side. Yes. With a magnifying glass and a lawyer at your side. I mean. I don't know that you would need a magnifying glass, but I don't know. I mean, the return on investment here, counsel, is just staggering. Sure. But at the same time. And it sure looks like your client was assisting. If it's determined that the scheme itself wasn't a material misrepresentation or fraudulent in any way, then it's our position that he wasn't in violation of the 1998 injunction. Because why? Because. Because he wasn't assisting? No. Because the second part of that in paragraph, in subsection B of that order, it specifically says, it addresses the material misrepresentation. If he is assisting. So there's no material misrepresentation here? It's our position that it's not. Okay. And Mr. Burke has consistently argued that. This is just good, honest business. It's Mr. Burke's position that from the beginning. I understand it's Mr. Burke's position, but I thought maybe we had been through this in the 1990s when the FTC issued an injunction and he signed it. Yes. And that he might have found other employment outside of these sweepstakes. Well, and for several years he did. But in terms of the assisting, I don't know that he was directly assisting. The money was just too good in the sweepstakes business. It's my position, Your Honor, that he, offering services isn't necessarily the same thing or in my mind going to the same thing as what the spirit of the 1998 injunction was for. Okay. I'm going to, we've taken much of your time and I will give you the two minutes that you requested. Thank you so much. We'll hear from the government. Good morning, Your Honor. Iman Abiy for the Federal Trade Commission. The 1998 injunction specifies what assisting involves. Other than working on the mailers themselves, Mr. Burke obtained the consumer lists from list brokers? Where do you, you know, when I looked at the factual findings that the district court made and then dug into the record to see the citations, one thing that I was interested in was that the evidence cited by the district court, these e-mails and letters and receipts, seemed very ambiguous. I didn't see a single document in there that unequivocally ties Burke to this specific scheme in a way that qualifies under the precise definition of assisting others. In fact, some of the documents that you folks rely on heavily don't seem to relate to this scheme at all. What is the strongest single piece of documentary evidence that you think brings Mr. Burke within the four corners of violating this injunction? Okay. We have a list of them. In terms of arranging for or consulting, in his own words, on the content of the e-mails between Mr. Burke and copywriters, receiving from them examples of what the mailers would look like, giving them instructions. Those e-mails, though, if you look at those e-mails, much of them were e-mails that were sent to Mr. Burke, and his part of that is just a snippet. Some of those e-mails refer to things like astrology in Japan, bulletins. Which of those e-mails specifically tied to content in this particular scheme and show Burke engaging in conduct that falls within this injunction? Well, let's look at some of them. 419, for example. On 412, Your Honor, is an exchange of e-mail where Mr. Burke tells the copywriter that the first version of the And he wanted it to have, quote-unquote, more heat. Does that e-mail, is there anything in that e-mail that tells me specifically what mailer we're talking about and whether it would come within this scheme? If you mean which particular mailer was used, was this in exchange to, no. Or was this a mailer related to this particular scheme? I mean, one of Mr. Burke's attributes seems to be that he's got his fingers in a lot of different pies and potentially is trying to make money in a lot of different ways. What in that e-mail links it to this particular scheme? There was only one scheme. Well, first the date that we're talking about is in 2012. The scheme was the FTC's complaint related to the mailers that were used between 2008 and 2013. So these were, it's an ongoing operation. It's not one mailer that was sent one time. So there was a constant back and forth about using this mailer, seeing how effective it is. But how do we know it's a mailer related to this scheme? As opposed to, there was no other mailing scheme. How do we know that? The e-mail talks about a mailer. But if, as I sit here today, is there anything in the record that tells me Burke was not engaged in some other scheme? This is a guy who, according to the FTC, is one of the world's great fraudsters. These were all e-mails that came from his own office, from his record. There was no other scheme that was alleged by the other side, by Mr. Burke. There was these e-mails, whether the authenticity of them or their relation to this particular scheme was never challenged below. They challenged generally your ability to prove by clear and convincing evidence that there was a violation of the injunction. Right. And you said that. But there was, but not that, but not this particular, whether this particular e-mail related to this particular scheme. There was no other scheme at issue. If they had said nothing, if they had stood mute at the hearing, it was your burden to show that the evidence you're relying on showed by clear and convincing evidence that he violated this injunction. And you gave the district court a lot of evidence that arguably has nothing to do with this scheme. Let me turn to a different piece of evidence that you rely on heavily. Before you do, just to match this question about this e-mail and others, how did the FTC obtain this e-mail? They obtained it from his offices when they got a TRO on an order of access to his businesses in Las Vegas. An order of access? From. So what, you mean FTC agents went in there and just gathered papers out of his office? Yes, Your Honor. And is there anything to show that the papers were identified in, you know, some folders or something like that to show. Yes, Your Honor. What they're related to? Yes. And what does the record show that, like what kind of files did this e-mail come out of? There are affidavits from the FTC investigators that provided the exact chain of custody between when the investigators went into Mr. Burt's offices, got the records, got the computers. I know that, but still in answer to Judge Lightman's question, what shows that this e-mail was related to any particular scheme, and if so, what scheme that was? I'm not sure how else we would show it other than showing. There could have been an attachment, for example. It might have been on a long chain of other e-mails, or there might have been an attachment that would show a mock-up of the sweepstakes letter or something like that. If that was attached to this e-mail, that might be a good indication as to what it related to. Well, this is exactly what is going on. If you look at EOR 414, for example, through EOR 418, it shows you first the text of the mailer that was being worked on at the time, and then they would send it to an artist. 414 is the e-mail that I read to opposing counsel. Yeah. 414, exactly. And then 418 shows that text put into the format that would look like the e-mailer that would be sent to the consumer. What about 522? 522. Glenberg wrote, yeah, $1.12 used to work really well. Now I need to find a bank that will take all those checks. Yes, Your Honor. And, in fact, the record shows that one of his banks had to pay the bank a $2,000 fee in order for the bank to accept processing. And I think that there's probably something that links this to a $1.12 payout, but how do we know what this is linked to? I mean, this would be very incriminating if we know that the $1.12 was actually what they were going to pay out in the sweepstakes scheme, but how do we know that? I can't tell that just from looking at this e-mail, although it seems very damning. Let me ask you something. These were all, these related, including, among other things, related to the list brokers that he was working with to purchase the consumer lists. There was only one scheme that is at issue. Mr. Burke never alleged that there was another scheme. Let me ask another underlying question. In the district court, did Mr. Burke object to the admission of these documents on any basis? No, Your Honor. In other words, they're irrelevant because they don't pertain to the scheme or they're not authenticated or something like that? No, Your Honor. So these documents that are in the excerpts were submitted to the district court and accepted by the district court without objection? Correct. All right. Even if we assume that you presented evidence that links Mr. Burke to this scheme, why was it appropriate for the district court to enter the contempt finding without an evidentiary hearing, given that Mr. Burke presented an affidavit from Mr. Seals that seems to contradict at least a couple important parts of what the district court found? Why shouldn't Mr. Burke face, looking down the barrel of a $20 million, $17 million contempt order, have had the right to present his witnesses? If I may just answer your question with my time out? It's up to the boss. Yeah. Please answer the question. Thank you. So there are two answers to that question, first, Your Honor. One is the affidavit by Mr. Seals itself contains the elements of Mr. Burke's liability, because Mr. Seals' affidavit says that Mr. Burke consulted on authorizing the sweepstakes. He said one of his responsibilities was to use his – this is – I'm looking at EOR 663 and 664. One of Mr. Burke's responsibilities was to use his American Express card, as well as various business accounts, to make sure that vendors and printers and developers and employees will all be paid for that scheme. What provision of the injunction does that violate? It would be under the assisted. The assisting others, when I first read the – this case, assisting doesn't seem to be defined in its ordinary sense. It has a very precise definition. Absolutely. And if all Mr. Burke was doing was paying vendors, where does that fall within any of the four prongs of assisting others? Well, it would fall into providing the names or assisting in the generation of potential customers for the entity, for example. So when he uses his business accounts or his own credit card to pay for the consumer lists that then would be used to mail these mailers to consumers, that would fall under provision three of this. The same with consulting on the content of the mailers would fall under provision two, formulating or providing or arranging for the formulation or provision of any So Mr. Seely's own affidavit, in fact, presents evidence of Mr. Burke's assistance and therefore liability for violating the injunction. I'd like to ask another question, if I may. Another underlying question. I think your opponent took the position that this injunction applies only to fraudulent schemes and that this scheme was not fraudulent. Now, was that issue raised in the district court? And if so, how did the district court rule on it? Was it raised? Well, it depends. It raised in the sense that they said that he did not violate the injunction. No, but didn't violate it because the scheme you're talking about was not fraudulent or for some other reason? It was not raised below the district court that this scheme, aside from Mr. Burke's role in it, that the scheme itself is not fraudulent, was not raised before the district court. Did the district court, you know, make any finding on whether the scheme was fraudulent or not?  I don't think so. He did? I know there was findings about, you know, material misrepresentation and things like that, but, you know, I don't think it uses the term a fraudulent scheme. No, it's not, because the language of the injunction does not talk about fraudulent. It talks about material misrepresentation in the purchase of a item or good or service. So whether or not a fraudulent misrepresentation is equal to or the same as a fraudulent scheme or an element of it, your position is that if the scheme involves a material misrepresentation, that's sufficient to violate the injunction? Yes, Your Honor. All right. Okay, that's all. Thank you. Thank you. Thank you, Your Honors. I briefly just want to address Judge Lightman's question to my opposing counsel with respect to this being the only scheme. It's not, and it's been Mr. Burke's position that it's not. In fact, Mr. Burke, throughout this entire process, has maintained that there was a rogue employee working in those office buildings named Katrina Willard who went out and was creating mailers on her own while utilizing Mr. Burke's name, his business accounts, as well as his office address and other likenesses to him. Did he say that she was using his e-mail? No, not the e-mail, Your Honor. What do we do with the one that I pointed out to counsel on 520? I'm sorry, with the what? That's the $1.12 one? Yeah, the $1.12 e-mail. Oh, the $1.12 e-mail. Well, Your Honor, that's a very... What's the innocent explanation for this one? Okay, so with respect to the e-mail itself, like you said, it appears to be very damning, but it goes back to the FTC put forth a lot of evidence, but they have not directly tied all of that evidence to Mr. Burke. Can you tell me that this is — did you controvert this? Is this related to something else? That I don't have facts on, Your Honor. I don't believe so, but I also don't know that... The $1.12 is a pretty — I mean, that's pretty specific, isn't it? It is, Your Honor, and... And he's going to go out and find a bank that will take all those checks. So it sounds like what was going on here, right? It does, Your Honor, but again, it's not Mr. — like you said, it's not Mr. Burke's burden. It was on... As I read Mr. Seals' affidavit, I don't think Mr. Seals' affidavit helps you very much, because Mr. Seals says, yeah, he was just doing some stuff for me. He was just paying accounts and he was just using his American Express card and he was just a consultant. Mr. Seals' affidavit on its own, with Your Honor's position that it doesn't help us much, might be true, but if you look at Mr. Seals' affidavit and all of the other evidence that would support that position, including their — so there's Mr. Seals' affidavit of what Mr. Burke was doing. There's the testimony of an employee named Lindy Reed, who also testified to the fact that Mr. Seals was running the scheme and that Mr. Burke answered to Mr. Seals. Sure. But that doesn't change anything about assisting. And paragraph 12 of the Seals' affidavit says, I authorize Mr. Burke to monitor certain accounts, a copy of such authorizing Glenn Ernest Burke as an employee to access the account. And, Your Honor, I would ask — I would then direct your attention to specifically EOR-126, it's page 4 of the 1998 injunction, paragraph — or I'm sorry, EOR-127, page 5 of the preliminary injunction. On the previous page, prohibited businesses practice. This is what Mr. Burke is prohibited from doing. Subsection C of that says, assisting others in violating any provision in subsections A and B of this paragraph. The previous page defines assisting others, but it's specifically delineated in the order from violating subsections A or B. Subsection B is the material misrepresentation subsection. If these mailers, or if Mr. Burke himself, did not engage in assisting others with making material misrepresentations to induce a consumer to purchase an item, service or good, then he did not violate his 1998 preliminary injunction. What about this issue? Let's say that, hypothetically, we had concerns about the strength of the government's Let me finish the question. Might not have been enough to get the government over its clear and convincing. But we also have here that Mr. Burke took the Fifth, and the district court credited the — or took the adverse inference against him, and the district court cited the rule that if there's independent evidence of the fact that can make the adverse inference, here the government presented, however strong, some independent evidence, and when you tack that on with his — the adverse inference that seems permissible here, why isn't that enough to get the government over the hurdle? Well, Your Honor, there was a lot of things going on at the time that Mr. Burke's deposition was taken. One, he took the Fifth on the advice of counsel, which now, in hindsight, if we had the crystal glass to look forward, it was good advice, because since this case has been filed, an indictment has been brought against Mr. Burke on criminal charges. So there's that issue. In addition, at the time that Mr. Burke's deposition was taken, he was undergoing extensive cancer therapy and chemotherapy. He actually had a medicine bag attached to his body at that time. So I don't know if Mr. Spilaccio could have given him any other advice than to preserve his Fifth Amendment rights, because we don't know what his state of mind was under the instance of that medication, if he had the ability to understand those questions. Those issues certainly could have been raised separately by motion for a protective order to stop his deposition. Instead, what happened was he took the Fifth, and wasn't it appropriate for the district court to say the government's paper evidence, however strong, even if that alone isn't enough to get us over clear and convincing, when we add in the permissible adverse inference here, that does get us. What would you do? Well, that raises another interesting issue, because the initial judge who issued the order that brought up the 2013 appeal in this case had since retired, and the judge that issued the order that we're operating from now in 2016 never heard any of the oral arguments or any of the evidence, but that decision was issued wholly on reviewing the briefs and the records. And I don't know that Judge Nafarro would necessarily have the same benefits that Judge Pro had from actually having the arguments presented in front of him. And further, there was definitely objections made to the government's papers that were presented at the district court level and have been since the beginning, because this wasn't started as a new action. It was brought as a contemptuous action from the 1998 injunction. The TRO, the preliminary injunction, all of those things were sought ex parte. The Court had all of this evidence in front of them before we even knew that something was happening. Any further questions? Okay. Thank you. Thank you. We thank both counsel for the argument. FTC v. Burke is submitted. The next case is Caldwell v. City and County of San Francisco.
judges: Tashima, Bybee, Leitman